**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRADLEY F. PODLISKA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| U.S. HOUSE OF REPRESENTATIVES ) | Civil Action No. 15-2037 |
| SELECT COMMITTEE ON THE EVENTS ) | |
| SURROUNDING THE 2012 TERRORIST ) | Jury Demand |
| ATTACK IN BENGHAZI, ) | |
| 1036 Longworth House Office Building, ) | Exempt from Filing Fees |
| Washington, D.C. 20515, and ) | Under 38 U.S.C. § 4323(h)(1) |
| ) | |
| HAROLD WATSON "TREY" GOWDY III, in ) | |
| his individual capacity, ) | |
| 1404 Longworth House Office Building, ) | |
| Washington, D.C. 20515, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Bradley F. Podliska ("Podliska" or "Plaintiff"), through counsel, respectfully submits this Complaint against the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi of the U.S. House of Representatives ("Benghazi Committee"), and Harold Watson "Trey" Gowdy III, Chairman of the Benghazi Committee and U.S. Representative of South Carolina's 4th Congressional District ("Chairman Gowdy").

## I. INTRODUCTION

1.    In this action, Podliska brings his claims against the Benghazi Committee under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-4335 ("USERRA"), and the Congressional Accountability Act, 2 U.S.C. §§ 1301-1438 ("CAA"), which applies USERRA to the United States Congress.  Podliska also brings claims against Chairman Gowdy for making false and defamatory statements that violated Podliska's

constitutional liberty interests.  This action is exempt from any filing fees pursuant to USERRA, 38 U.S.C. § 4323(h)(1).

2.      USERRA guarantees servicemembers both the right to be free of discrimination based on their military service and the right to return to their civilian jobs after serving in the Armed Forces. 38 U.S.C. §§ 4311, 4312.  USERRA also gives servicemembers a right to enforce their rights in federal court. *Id.* § 4323. Congress declared, in describing the purpose of USERRA, "that the Federal Government should be a model employer in carrying out the provisions of the Act." *Id.* § 4301(b).  The CAA guarantees the protections of USERRA for employees of the legislative branch.  2 U.S.C. §§ 1302(a)(11), 1316, & 1361(d)(2).

3.      In June 2015, Podliska was unlawfully fired by the Benghazi Committee because he sought to exercise his rights under USERRA.  This followed months of increasing hostility towards Podliska because he left work to fulfill his military obligations as a reservist.  As soon as Podliska announced that he intended to file a civil suit as authorized by the CAA and USERRA, Chairman Gowdy and his Benghazi Committee staffers responded by intentionally defaming Podliska, making numerous false allegations to multiple national news outlets.  Chairman Gowdy, personally and through his agents, tied these defamatory statements to Podliska's firing to damage Podliska's reputation and his ability to seek or secure employment in his chosen field, depriving Podliska of his rights under the Constitution of the United States.

## II.  PARTIES

4.       Plaintiff BRADLEY F. PODLISKA is a citizen of Arlington County, Virginia.[1]

5.      Defendant BENGHAZI COMMITTEE is a congressional committee of the

---

[1] Plaintiff will move the Court for an order to file his address under seal.

U.S. House of Representatives, with offices located at 1036 Longworth House Office Building, Washington, D.C. 20515, tasked with investigating the September 11, 2012 attack on the U.S. facilities in Benghazi, Libya. The Benghazi Committee's Majority Staff ("Majority Staff") works for and serves at the direction of Defendant Gowdy in his capacity as the Chairman of the Benghazi Committee.

6.     Defendant HAROLD WATSON "TREY" GOWDY III is the United States Representative of South Carolina's 4th Congressional District, and since May 2014, has served as the Chairman of the Benghazi Committee.   His congressional office is located at 1404 Longworth House Office Building, Washington, D.C. 20515.   Chairman Gowdy is an attorney. During most of his career as an attorney, Chairman Gowdy worked as a prosecutor.

### III.  JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 2 U.S.C. §§ 1302(a)(11), 1316, 1404 & 1408; 38 U.S.C. § 4323; and 28 U.S.C. § 1331 & 1367.  Plaintiff fully exhausted his CAA and USERRA claims by filing a timely request for counseling, and participating in mediation that was completed more than 30 days prior to the filing of this Complaint.

8.     Venue is proper in this judicial district under 2 U.S.C. § 1404(2), as Plaintiff has filed suit in the District Court for the District of Columbia and was employed by the Benghazi Committee in this District.  Venue is also proper under 38 U.S.C. § 4323(c)(2), and 28 U.S.C. § 1391(b), as Defendant Benghazi Committee is located in this judicial district, Chairman Gowdy works and has a congressional office in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in this judicial district, including the

termination of Plaintiff and many of the false and defamatory statements that Chairman Gowdy made about Plaintiff.

## IV. FACTS

9.      Plaintiff has served in the Air Force Reserve as an Intelligence Officer since 1999. In his capacity as an officer in the Air Force Reserve, Plaintiff currently holds the rank of Major and the security clearances necessary for his position. The Air Force Reserve requires (and required at all relevant times related to this Complaint) the Plaintiff, as an Individual Mobilization Augmentee ("IMA"), to perform training and duties as an integrated member of a Combatant Command ("COCOM") organization.   At times, the Air Force Reserve ordered Plaintiff to perform his IMA military service in addition to his annual training obligation.

10.     In his professional civilian career, Plaintiff has worked as an intelligence analyst in the national security-related industry.  Plaintiff attained a master's degree from Georgetown University in National Security Studies and a Ph.D. in Political Science (with a focus in International Relations) from Texas A&M University.  From 1997 to 2014, Plaintiff worked at a federal defense agency on security and foreign policy issues.

11.     On September 11, 2012, terrorists attacked the U.S. Department of State ("State Department") compound and another U.S. government annex in Benghazi, Libya. During the attack, Christopher Stevens, the U.S. Ambassador to Libya, and three other Americans were killed.

12.     On May 8, 2014, the U.S. House of Representatives adopted House Resolution 567, which established the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi.  The Benghazi Committee is authorized and directed to conduct a full and complete investigation and to study and issue a final report of its findings to the House of

Representatives regarding the policies, decisions, and activities regarding the attack on the U.S. Special Mission Compound and U.S. government annex in Benghazi, Libya. Representative Trey Gowdy is the Chairman of the Benghazi Committee.

13.     Philip Kiko ("Kiko") is staff director of the Majority Staff and, thus, was Plaintiff's supervisor and, in conjunction with Chairman Gowdy, is responsible for making personnel decisions regarding the Majority Staff.

14.     Christopher Donesa ("Donesa") is deputy staff director of the Majority Staff. As Kiko's deputy, Donesa was also Plaintiff's supervisor. Donesa, in conjunction with Chairman Gowdy and Kiko, is responsible for making personnel decisions regarding the Majority Staff.

15.     Upon information and belief, Plaintiff was hired as an investigator for the Majority Staff of the Benghazi Committee by Staff Director Kiko, who was following the directives of Chairman Gowdy. Upon information and belief, Chairman Gowdy retained ultimate authority for the personnel decisions of the Majority Staff throughout Plaintiff's employment.

16.     Plaintiff began his employment for the Majority Staff on September 2, 2014, and was tasked with investigating the Intelligence Community and the Obama Administration's response to the Benghazi attack, among other things.

17.     From the inception of Plaintiff's employment until March 1, 2015, Plaintiff was neither disciplined nor placed on a performance improvement plan for any work performance deficiency. In fact, on February 25, 2015, Kiko praised Plaintiff's performance in an e-mail, stating Plaintiff was doing "great work."

18.     On March 2, 2015, during the investigation into the Benghazi attack, Plaintiff informed Kiko, Donesa, and Majority Chief Counsel Dana Chipman ("Chipman") via e-mail

that, to satisfy his commitment as a reservist, he was obligated to serve 39 days with the Air Force as an IMA, and that his first duty assignment during his time with the Benghazi Committee would be two weeks beginning on March 14, 2015.

19.     Kiko sent an e-mail in reply, the full text of which was, "wow".

20.     Plaintiff performed his Air Force annual training as an integrated member of a COCOM organization from March 14 to March 27, 2015.

***DEFENDANT BENGHAZI COMMITTEE'S DISCRIMINATION AND RETALIATION AGAINST PLAINTIFF***

21.     Plaintiff began to encounter problems with the leadership of the Majority Staff immediately upon his return from military service in March 2015.

22.     Plaintiff noted a significant change in Kiko's attitude and demeanor the moment Plaintiff returned from military duty.  Kiko no longer acted cordially towards Plaintiff and offered him little, if any, work opportunities.

23.     Also, beginning in March 2015, Chipman noticeably started to distance himself from Plaintiff's objective investigative efforts.  Prior to March 2, 2015, Chipman regularly attended Plaintiff's post-attack briefings with Representatives Jim Jordan and Mike Pompeo[2] and had praised Plaintiff's work.  But Chipman, like Kiko and Donesa, began to criticize Plaintiff's work after Plaintiff informed them that he was required to perform military service.  For example, Representative Jordan was particularly interested in information about "talking points" underlying the comments made to the media by then-United States Ambassador to the United Nations Susan Rice on September 16, 2012, but after March 2, Chipman called this issue "shit." Both Chipman and Kiko were well aware that part of Plaintiff's investigation addressed these talking points and related matters, as requested by Representative Jordan.

---

[2] Representatives Jordan and Pompeo serve the 4th Congressional Districts of Ohio and Kansas, respectively, and are members of the Benghazi Committee.

24.     In another incident, Kiko approached Plaintiff and stated, "I know you have your post-attack piece.  But, only right wing nut jobs [meaning Representative Jordan] care about that. You have no idea what we're doing here.  You have no clue what's going on."

25.     During the month that Kiko and Donesa began to treat Plaintiff differently, the Committee's investigation changed significantly to focus on Secretary of State Hillary Clinton and the State Department, and deemphasize the other agencies that were involved in the Benghazi attack and the aftermath of the attack. In particular, Majority Staff who were present during Plaintiff's military service in March 2015 informed Plaintiff that the Committee's investigation had become an "agency-centric investigation," *i.e.*, focused on a single federal agency, the State Department, and that the term "agency-centric investigation" had been used by the leaders of the Majority Staff.

26.     Based upon the facts above, and the general atmosphere created by Kiko and Donesa prior to the Committee's shift to an agency-centric investigation, it was clear to Plaintiff that he was being singled out because of his military service and because he was unwilling to go along with the hyper-focus on the State Department and Secretary Clinton based upon the fact that his comprehensive, thorough, and objective investigation was pointing at other agencies and individuals and not solely the State Department and Secretary Clinton.

27.     On April 14, 2015, Plaintiff suggested that Majority Staff employees, as a team build event, meet at the National Pork Producers Council's Congressional "Rack of Pork" reception, an event that is attended by a large and diverse group of Members of Congress and their staff.[3]  Although there was nothing improper about Plaintiff or the Majority Staff attending

_____

[3] Arranged to coincide with NPPC's annual "fly-in" the "Rack of Pork" is a reception at which "pork producers and swine veterinarians, who lobbied their congressional lawmakers on

the event, Kiko reprimanded Plaintiff for sending the team build e-mail.  Kiko's reprimand of Plaintiff was clearly retaliatory, as many other Majority Staff employees routinely sent out "team build" e-mails for similar events, for which they were not reprimanded.

28.     Furthermore, at the same time that Plaintiff was reprimanded regarding the "Rack of Pork" team build event, several Majority Staff members were encouraged to engage in far more questionable activities.  For example, Senior Counsel Sharon Jackson organized alcohol-infused drinking sessions in the Majority Staff's office during the workday.  These drinking sessions were referred to as "Wine Wednesdays," in which some Majority Staff members would drink from custom-made wine glasses that were engraved with the words "glacial pace," poking fun at Benghazi Committee Ranking Member Representative Elijah Cummings.  Ranking Member Cummings had used the phrase to suggest that the Majority Staff was slowing down the investigation so that it would end during the 2016 Presidential Campaign.  Kiko not only authorized these activities, but he actively participated in the drinking sessions.  Jackson also organized a gun buyer's club, in which she and at least three other staff members spent hours at a time during work hours, meeting in the conference room to design custom-made, monogrammed, silver-plated, "Tiffany-style" Glock 9 millimeter semi-automatic pistols.[4]

29.     In early May 2015, Plaintiff was again called to Germany by the U.S. Air Force Reserve to perform military service with a COCOM organization.  Plaintiff took military leave from the Benghazi Committee from May 4 to May 27, 2015.

---

issues of importance to the U.S. pork industry," can socialize with "Capitol Hill staff and lawmakers." *See* http://www.nppc.org/2014/09/for-the-week-ending-sept-12-2014/.

[4] Eric Lipton, Noam Scheiber, & Michael S. Schmidt, *Clinton Emails Became the New Focus of Benghazi Inquiry,* NEW YORK TIMES (Oct. 11, 2015), available at http://www.nytimes.com/2015/10/12/us/politics/clinton-emails-became-the-new-focus-of-benghazi-inquiry.html?_r=0 (last accessed Nov. 19, 2015).

30.     While Plaintiff was on military leave, Chief Counsel Chipman stated to Majority Staff member Mark Grider, "I question whether Brad [Plaintiff] really needs to go to Germany," where Plaintiff was serving out the remainder of his annual military duties.

31.     Chipman's comment regarding Plaintiff's military service was overheard by another senior member of the Majority Staff who questioned Grider about Chipman's comments. During this conversation, Grider admitted that Chipman had questioned the validity of Plaintiff's military obligations on a previous occasion as well.

32.     In late May 2015, Plaintiff completed his military duties in Germany and timely returned to the Committee to work on his investigations for the Benghazi Committee.

33.     Throughout the month of June 2015, Kiko and Donesa refused to give Plaintiff any work and would not talk to him, not even to exchange pleasantries in passing as both routinely did with other members of the Majority Staff.

34.     Kiko's and Donesa's refusal to give Plaintiff any work and refusal to engage him in the workplace in close proximity to him returning from performing military service is evidence of Kiko's and Donesa's animus toward Plaintiff's military service or status.

35.     On or about June 8, 2015, Donesa called Plaintiff into his office and reprimanded Plaintiff for allegedly improperly assigning an unauthorized project to Majority Staff interns.

36.     In fact, the work Plaintiff had assigned to the staff interns was neither improper nor unauthorized because that work and the use of interns had been approved by Kiko and Donesa in a meeting with Plaintiff and another senior staff member.

37.     In the June 8 meeting, Plaintiff questioned Deputy Staff Director Donesa about the fact that half of the staff was, at any given time, primarily surfing the Internet as opposed to conducting an investigation.  To this, Donesa responded, "I'd rather have them surfing the Web

than conducting an investigation like you."  Donesa also stated that Plaintiff was not "rowing with the team."  At that time, the investigation Plaintiff had been conducting was focused on a number of federal agencies that were involved in the aftermath of the Benghazi attack.  In response to the rowing-team comments, Plaintiff explained to Donesa that he was there to investigate the Benghazi attack.  To this, Donesa threatened, "I hope we don't have a discussion like this again."

38.     This was not the first time that Donesa deliberately attempted to curtail Plaintiff's objective, professional, and thorough investigative efforts.  Prior to Plaintiff's June 8 exchange with Donesa, Donesa told Plaintiff to "keep his head down" after Plaintiff provided Donesa with his preliminary findings regarding the Obama administration's response to the Benghazi attacks, and those findings focused on the role of a number of agencies, not merely on the State Department's role or the role of Secretary Clinton.

39.     On June 9, 2015, Plaintiff met with Majority Staff Finance and Personnel Administrator Anne Binsted to review his own personnel file.  At that time, Binsted confirmed that there were no disciplinary records, negative personnel reports, counseling, or other security entries in his file.

40.     On June 15, 2015, when Plaintiff arrived at a deposition of a witness in order to assist his colleagues, Kiko made a beeline for Plaintiff, got in his face in an intimidating manner, and demanded, "What are you doing here?" Given that Plaintiff is a subject matter expert on an area that the witness was set to testify about, Kiko's actions in singling out Plaintiff were not only personally degrading, but detrimental to the Committee's investigation.

41.     On June 19, 2015, the Majority Staff's Security Manager John McIntyre "Mac" Tolar ("Tolar"), confronted Plaintiff and accused him and three other Majority Staff members of

a security violation for allegedly putting classified material onto an unclassified system.  The allegations were completely false and merely a pretext for discrimination.  Plaintiff had used only publicly available sources from the Internet to write the document that Tolar believed to contain classified material, and to give rise to the alleged security violation.

42.     Notably, Tolar was, at best, a novice in regard to classification review, whereas Plaintiff was not only trained in the area, but had three years of direct experience doing classification review.  Tolar admitted to Plaintiff that he had not used a classification manual in his review; the use of a classification manual is a standard requirement for a security violation review.

43.     Tolar was also, at best, poorly trained, and at worst, completely disregarded the most basic security management procedures.  For example, Tolar disobeyed the standard procedures for any level of classification review by printing out the alleged classified material on an unclassified system and interviewing the four accused staffers in a non-security-approved conference room.  Second, Tolar told the four accused staff members, as well as Chipman and Donesa, to delete the alleged classified documents from their computers because he did not want the "Democrats finding out about it."  It should be noted that Tolar held the non-partisan Security Manager position and was employed to serve both the Majority and Minority staffs.

44.     Later, Tolar acknowledged that the information in the document at issue was not classified.

45.     Tolar was never reprimanded for his violations of security protocol.  Tolar also did not receive any adverse employment action.

46.     Ultimately, Plaintiff was the only one of the four accused of the trumped-up security violation to be reprimanded by the Majority Staff or subjected to any adverse

employment action.   The other three non-reprimanded individuals involved in this alleged security violation are not members of the National Guard or Reserves and did not perform any military service during their employment by the Benghazi Committee.

47.     On June 26, 2015, Plaintiff was summoned to Kiko's office. Donesa was also present.  Kiko threatened Plaintiff with an ultimatum: if he did not agree to tender his resignation within 30 days, he would be terminated.

### PLAINTIFF'S USERRA PROTECTED ACTIVITY

48.     After receiving this ultimatum, Plaintiff hired an attorney to enforce his rights under USERRA, and his attorney informed the Majority Staff on June 28, 2015, that he was representing Plaintiff.   Hiring a lawyer to enforce one's rights under USERRA constitutes protected activity under the Act for which retaliation is forbidden.  38 U.S.C. § 4311(b).

49.     In a June 28, 2015, e-mail, Plaintiff's attorney stated: "I have been retained by Mr. Podliska to amicably resolve the current situation. Before anyone on either side takes any affirmative steps and the matter escalates, I'd like to discuss the situation and get a better sense of the Benghazi Committee's perspective. I am sure you would agree that such a course of action is the most prudent way to proceed for all concerned."

50.     Upon information and belief, on or about June 28, 2015, Kiko and Donesa conferred with attorneys of U.S. House Employment Counsel, including Russell Gore ("Gore"), about how to address Plaintiff's concerns about his mistreatment by the Benghazi Committee.

51.     On June 29, 2015, Plaintiff was summoned to Kiko's office. Kiko and Donesa were both present. Plaintiff was terminated and ordered to leave the Majority Staff office immediately.

52.     On June 29, 2015, Plaintiff again met with Anne Binsted, with whom he had previously met to review his personnel file, and confirmed that there were no negative personnel documents in his personnel file.

### PLAINTIFF'S COMPLIANCE WITH THE CONGRESSIONAL ACCOUNTABILITY ACT

53.     On August 5, 2015, Plaintiff made a timely request for counseling from the Office of Compliance pursuant to 2 U.S.C. § 1402.

54.     On September 9, 2015, Plaintiff was notified in writing by the Office of Compliance that the period of counseling had ended.

55.     On September 10, 2015, Plaintiff initiated mediation pursuant to 2 U.S.C. § 1403, and thereafter participated in mediation with the Office of Compliance, House Employment Counsel, and Benghazi Committee staffers.

56.     On October 14, 2015, Plaintiff's counsel received notice from the Office of Compliance informing him that "the mediation period has ended in the above matter without a resolution of your client's claims. The counseling period began on August 5, 2015 and ended on September 4, 2015. The mediation period began on September 10, 2015 and ended on October 13, 2015."

57.     Plaintiff has fulfilled all of the requirements in 2 U.S.C. §§ 1401-04 to file his lawsuit in a district court pursuant to 2 U.S.C. § 1408.

### DEFENDANT CHAIRMAN GOWDY'S DEFAMATORY STATEMENTS ABOUT PLAINTIFF

58.     On September 29, 2015, Plaintiff caused a litigation hold letter to be sent to the Office of House Employment Counsel, care of Gloria Lett, Russell Gore and Mark Hayes.

59.     On or about October 10, 2015, the Benghazi Committee, Chairman Gowdy, and their agents on the Majority Staff began communicating with the national news media –

including CNN, *The New York Times*, *The Washington Post*, and other national newspapers, web sites, and broadcast news outlets – about the Benghazi Committee's termination of Plaintiff in an effort to retaliate against Plaintiff for exercising his rights under the CAA and USERRA, to damage Plaintiff's reputation, and to punish Plaintiff by making it harder for him to obtain future employment.

60.     Over the next several days, the Benghazi Committee and Chairman Gowdy released or made a number of false and/or defamatory statements in the national news media. The most significant false and defamatory statement that the Benghazi Committee and Gowdy repeated in numerous national news outlets was that Plaintiff "mishandled classified information."

61.     For example, on October 11, 2015, Chairman Gowdy issued an extensive statement to the news media in which he stated: "'The record makes it clear not only did he [Podliska] mishandle classified information, he himself was focused on Clinton improperly and was instructed to stop[.]'"[5] The Benghazi Committee and Gowdy also caused the same statement to be published in numerous national and regional news outlets, such as *The Washington Times* and *National Journal*.

62.     On the evening of October 11, 2015, NBC News aired an interview of Gowdy that was conducted by Kristen Welker and taped on or about October 11, 2015. In the interview, Chairman Gowdy characterized Plaintiff's allegations about how he was mistreated by the

---

[5] Jim Geraghty, *An Ex-Benghazi Committee Staffer Says Exactly What Hillary Needed (UPDATED)*, NAT'L REVIEW ONLINE's *The Corner* (Oct. 12, 2015), available at http://www.nationalreview.com/corner/425412/ex-benghazi-committee-staffer-says-exactly-what-hillary-needed-updated-jim-geraghty (last accessed Nov. 18, 2015).

Benghazi Committee as "a damn lie,"[6] and then proceeded to state that Plaintiff was "a lousy employee, and that was evidenced by the fact that he mishandled classified information."[7] The same statement by Gowdy was aired on NBC's *Today* show, which, upon information and belief, was watched by millions of Americans.[8]

63.     Chairman Gowdy's written statement and interview with NBC News contained numerous additional false allegations of misconduct by Plaintiff.

64.     In addition to making false and defamatory statements about Plaintiff, in his written and oral statements to the national media Chairman Gowdy communicated detailed information about the mediation process in which Plaintiff and the Benghazi Committee had participated. Specifically, Chairman Gowdy stated that Plaintiff "was losing in mediation on his reservist claim"[9] and that Plaintiff "has demanded money from the Committee" and "the Committee has refused to pay him."[10]

65.     On October 12, 2015, counsel for Plaintiff sent a cease and desist letter to Gore and Hayes, the Benghazi Committee's lawyers. The letter stated in part:

---

[6] Interview by Kristen Welker, NBC News, with Chairman Gowdy (Oct. 11, 2015), available at https://youtu.be/OUPR8Fn5D4k?t=1m4s (last accessed Nov. 19, 2015).

[7] *Id.*, available at http://www.nbcnews.com/news/us-news/ex-benghazi-investigator-alleges-rep-gowdy-violated-federal-law-n443166 (last accessed Nov. 18, 2015).

[8] Chris Ariens, *Morning Show Ratings: Week of October 13*, ADWEEK.COM (Oct. 22, 2015) (showing average ratings that week of 4.4 million people), available at http://www.adweek.com/tvnewser/morning-show-ratings-week-of-oct-12/275266 (last accessed Nov. 18, 2015).

[9] Ari Melber, *Ex-Benghazi Investigator Alleges Rep. Gowdy Violated Federal Law*, NBC News (Oct. 12, 2015), available at http://www.nbcnews.com/news/us-news/ex-benghazi-investigator-alleges-rep-gowdy-violated-federal-law-n443166 (last accessed Nov. 19, 2015). *See also* Welker interview, *supra* note 6, available at https://youtu.be/OUPR8Fn5D4k?t=1m10s (last accessed Nov. 19, 2015).

[10] Geraghty, *supra* note 5.

> Your clients, Chairman Trey Gowdy and the Select Committee on Benghazi's majority staff, must immediately cease and desist from violating the Congressional Accountability Act's prohibition on the disclosure of the content of mediation. *See* 2 U.S.C. § 1416(a)-(b).
>
> * * *
>
> Aside from the deliberate falsity of those characterizations, both you and your clients know that the public disclosures made by Chairman Gowdy and the Benghazi Committee clearly violate both the Congressional Accountability Act and the Mediation and Confidentiality Agreement that you both signed.
>
> Please confirm that your clients will immediately stop violating the Congressional Accountability Act and the Mediation and Confidentiality Agreement.

66.     By Monday, October 12, 2015, Chairman Gowdy had already effectively defamed Plaintiff in the national media, including the charge that Plaintiff "mishandled classified information"; a serious crime that has ended the careers of many in national security related positions, and one that can subject an individual to criminal penalties, including imprisonment.[11]

67.     Despite his prior unequivocal statements about Plaintiff, later that day Chairman Gowdy did an about-face during his appearance on Fox News. Chairman Gowdy now suggested that he lacked knowledge about Plaintiff's termination. For example, on October 11, 2015, Chairman Gowdy had stated in writing and in his NBC interview that Plaintiff was terminated.[12]

---

[11] On April 23, 2015, General David Petraeus pled guilty to mishandling classified information and was sentenced to two years of probation and a $100,000 fine. Adam Goldman, *Petraeus pleads guilty to mishandling classified material, will face probation*, Washington Post (April 23, 2015), available at https://www.washingtonpost.com/world/national-security/petraeus-set-to-plead-guilty-to-mishandling-classified-materials/2015/04/22/3e6dbf20-e8f5-11e4-aae1-d642717d8afa_story.html (last accessed Nov. 19, 2015). As a former federal prosecutor, Chairman Gowdy was keenly aware that mishandling classified information is a crime and he was certainly aware of Petraeus' fall from glory, and the criminal penalties that resulted from Petraeus' admission of mishandling classified information.

[12] Geraghty, *supra* note 5 (stating "he was terminated", "before his termination", etc.).

But on October 12, Chairman Gowdy told a Fox News reporter on the air that he did not know if Plaintiff had been "terminated" or "resigned."[13]   While on October 11, 2015, Gowdy had revealed specific details about the internal communications of the mediation process and the positions taken by the parties,[14] on October 12 Chairman Gowdy said, "I haven't been part of the mediation process.  I haven't been part of any of that."[15]

68.   Upon information and belief, Chairman Gowdy knew that the aforementioned public statements he made to the media, including the allegation that Plaintiff mishandled classified information, were false, or he was reckless in disregard to the truth or falsity of those statements.

69.   Upon information and belief, before he made the aforementioned public statements about the mediation process (in which he now states that he played no role), Chairman Gowdy learned what happened in mediation from Gore, the Benghazi Committee's lead counsel in this matter, or through his senior staffers' communications with Gore.

---

[13] *On the Record with Greta Van Susteren* (Fox News Channel broadcast Oct. 12, 2015), available at https://www.youtube.com/watch?v=Wxg66GN7FgQ (last accessed Nov. 18, 2015).

[14] Geraghty, *supra* note 5 (describing Plaintiff's actions "throughout the pendency of an ongoing legal mediation").

[15] Van Susteren, *supra* note 13.

17

## V. CAUSES OF ACTION

### COUNT I

**DEFENDANT BENGHAZI COMMITTEE'S VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT, 2 U.S.C. § 1316(A)-(B) FOR VIOLATING THE PLAINTIFF'S RIGHTS UNDER THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT, 38 U.S.C. § 4311(A), BY DISCRIMINATING AGAINST PLAINTIFF BECAUSE OF HIS OBLIGATIONS TO SERVE IN THE U.S. MILITARY**

70.     Plaintiff re-alleges paragraphs 1 through 69 above and incorporates them as if fully set forth herein.

71.     Defendant Benghazi Committee, and its employees and agents, acting under authority delegated to them by Chairman Gowdy and by it as the employing office, violated Plaintiff's rights guaranteed by the CAA and USERRA, including but not limited to the anti-discrimination provisions of 2 U.S.C. § 1316 and 38 U.S.C. § 4311(a).

72.     The Benghazi Committee, including its employees and agents, unlawfully discriminated against Plaintiff in violation of 2 U.S.C. § 1316(a)(1)(A) and 38 U.S.C. § 4311(a) on the basis of his membership, service, and/or obligations to perform military service in the uniformed service.  The leaders of the Benghazi Committee were disturbed that Plaintiff would take leave from his investigative work on the Benghazi Committee to serve in the U.S. Air Force in March and May of 2015, believed that it was unnecessary for Plaintiff to serve his country in that capacity, and thought that Plaintiff was not being a team player by taking leave to serve in the military.  Their response was to deny Plaintiff the opportunity to continue his employment, the terms, conditions, status and privileges of employment shared by other employees; repeatedly denigrate Plaintiff before other employees of the Benghazi Committee; disparately discipline him; make false allegations of improper work and even criminal misconduct; and, finally, deliver an ultimatum that he resign or be terminated.

73.     Plaintiff's military service, membership, and obligations were a motivating factor in these adverse employment actions taken against Plaintiff by Defendant in violation of 38 U.S.C. § 4311(a) for which Plaintiff has lost pay and benefits.

74.     The Benghazi Committee's discrimination against Plaintiff in violation of USERRA, 38 U.S.C. § 4311(a), was willful as Defendant either knew or showed reckless disregard for whether its conduct was prohibited under the provisions of CAA and USERRA, as defined by 2 U.S.C. § 1316(a)(1)(A) and 38 U.S.C. § 4311(a).  Pursuant to 2 U.S.C. § 1316(b), 38 U.S.C. § 4323(d), and 20 C.F.R. § 1002.312(c), liquidated damages are available under the CAA for willful violations of USERRA, 38 U.S.C. § 4311(a).

75.     At all times relevant hereto, Defendant and its agents had a duty to conduct themselves in compliance with the law of USERRA and to ensure its agents followed the Act.

76.     The supervisors to whom Defendant gave responsibility over the employment decisions alleged in this Complaint, including Benghazi Committee Staff Director Kiko and Deputy Staff Director Donesa, had actual or constructive knowledge of the requirements imposed upon employers under USERRA, including, but not limited to, posted USERRA workplace notices and the Benghazi Committee's applicable employment policies or procedures.

77.     To the extent that the Benghazi Committee's alleged application of any contract, agreement, policy, or practice of Defendant constitutes any limitation on Plaintiff's rights under USERRA, it is illegal, null and void, inapplicable, of no force or effect, and superseded by 38 U.S.C. § 4302(b).

## COUNT II

### DEFENDANT BENGHAZI COMMITTEE'S VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT, 2 U.S.C. § 1316(A)-(B) FOR VIOLATING THE PLAINTIFF'S RIGHTS UNDER THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT, 38 U.S.C. § 4311(B), BY RETALIATING AGAINST PLAINTIFF FOR EXERCISING AND ENFORCING HIS RIGHTS UNDER USERRA

78.     Plaintiff re-alleges paragraphs 1 through 77 above and incorporates them as if fully set forth herein.

79.     Defendant Benghazi Committee, and its employees and agents, acting under authority delegated to them by Chairman Gowdy, and by it as the employing office, violated Plaintiff's rights guaranteed by the CAA and USERRA, including but not limited to the anti-discrimination provisions of 2 U.S.C. § 1316 and 38 U.S.C. § 4311(b).

80.     The Benghazi Committee, including its employees and agents, unlawfully retaliated against Plaintiff in violation of 2 U.S.C. § 1316(a)(1)(A) and 38 U.S.C. § 4311(b) by terminating Plaintiff because Plaintiff took action to enforce the protections afforded to him by USERRA and exercise his rights under USERRA.

81.     In June 2015, Plaintiff complained to the Benghazi Committee's leadership that their discriminatory and retaliatory actions were based on his past and ongoing military commitments. He then hired an attorney to enforce and exercise his rights under USERRA by instructing that lawyer to contact the Benghazi Committee in order to assert, exercise, and enforce Plaintiff's rights.   Within hours of Plaintiff's lawyer contacting the Committee's leadership to address Plaintiff's concerns about how he had been mistreated, the Committee terminated Plaintiff, thereby engaging in retaliation and an adverse employment action in violation of 38 U.S.C. § 4311(b).

82.     The action that Plaintiff took to enforce and exercise his rights under USERRA was a motivating factor in the Benghazi Committee's decision to terminate Plaintiff in late June 2015, for which Plaintiff has lost pay and benefits.

83.     The Benghazi Committee's termination of Plaintiff in violation of USERRA, 38 U.S.C. § 4311(b), was willful as Defendant Benghazi Committee either knew or showed reckless disregard for whether its conduct was prohibited under the provisions of CAA and USERRA, as defined by 2 U.S.C. § 1316(a)(1)(A) and 38 U.S.C. § 4311(b).  Pursuant to 2 U.S.C. § 1316(b), 38 U.S.C. § 4323(d), and 20 C.F.R. § 1002.312(c), liquidated damages are available under the CAA for willful violations of USERRA, 38 U.S.C. § 4311(b).

84.     At all times relevant hereto, the Benghazi Committee and its agents had a duty to conduct themselves in compliance with the CAA and USERRA, and to ensure its agents followed the Acts.

85.     The supervisors to whom the Benghazi Committee gave responsibility over the employment decisions alleged in this Complaint, including Staff Director Kiko and Deputy Staff Director Donesa, had actual or constructive knowledge of the requirements imposed upon employers under USERRA, including, but not limited to, posted USERRA workplace notices and Defendant's applicable employment policies or procedures.

86.     To the extent that Defendant's alleged application of any contract, agreement, policy or practice of Defendant constitutes any limitation on Plaintiff's rights under USERRA, it is illegal, null and void, inapplicable, of no force or effect, and superseded by 38 U.S.C. § 4302(b).

## COUNT III

### DEFENDANT BENGHAZI COMMITTEE'S VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT, 2 U.S.C. § 1316(A)-(B) FOR VIOLATING THE PLAINTIFF'S RIGHTS UNDER THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT, 38 U.S.C. § 4318, BY FAILING TO CREDIT PLAINTIFF'S RETIREMENT ACCOUNT

87. Plaintiff re-alleges paragraphs 1 through 86 above and incorporates them as if fully set forth herein.

88. The CAA, 2 U.S.C. § 1316(a)(1)(C), and USERRA, 38 U.S.C. § 4318, require employers to take specific actions to ensure that a servicemember who engages in qualified military service receives the same pension rights and benefits as if he had continued to work continuously for the employer.

89. USERRA provides that "A person reemployed under [USERRA] shall be treated as not having incurred a break in service with the employer or employers maintaining the plan by reason of such person's period or periods of service in the uniformed services," and that "[e]ach period served by a person in the uniformed services shall, upon reemployment under this chapter, be deemed to constitute service with the employer or employers maintaining the plan for the purpose of determining the nonforfeitability of the person's accrued benefits, and for the purpose of determining the accrual of benefits under the plan." 38 U.S.C. § 4318(a)(2). Accordingly, USERRA mandates that an employer is "liable to an employee pension benefit plan for funding any obligation of the plan to provide the benefits described in subsection (a)(2) [of § 4318] and shall allocate the amount of any employer contribution for the person in the same manner and to the same extent the allocation occurs for other employees during the period of service." *Id.* § 4318(b)(1).

90. Under 38 U.S.C. § 4318(b)(2), if an employee is required to make a contribution to his pension before the employer will match the contribution, an employer is obligated to make a matching contribution once an employee has made his contribution to the pension plan.

22

91.     The Department of Labor has interpreted USERRA, 38 U.S.C. § 4318, to require an employer to make its portion of the servicemember-employee's retirement contribution within 90 days of the employee's return to work.  20 C.F.R. § 1002.262. The same regulations state that "Any employer contributions that are contingent on or attributable to the employee's make-up contributions or elective deferrals must be made according to the plan's requirements for employer matching contributions."  *Id.*

92.     The CAA explicitly makes 38 U.S.C. § 4318 applicable to an employing office like the Benghazi Committee. 2 U.S.C. § 1316(a)(1)(C).

93.     Upon information and belief, the Benghazi Committee failed to provide service credit to Plaintiff for the time that he engaged in qualified military service in March and May 2015, failed to make the employer's component of Plaintiff's retirement contributions within 90 days of his reemployment in March and May 2015, and failed to make its matching employer contribution in accordance with the requirements of the plan.

<u>COUNT IV</u>
**DEFENDANT CHAIRMAN GOWDY'S VIOLATION OF DISTRICT OF COLUMBIA DEFAMATION LAW FOR MAKING FALSE AND DEFAMATORY STATEMENTS ABOUT PLAINTIFF**

94.     Plaintiff re-alleges paragraphs 1 through 93 above and incorporates them as if fully set forth herein.

95.     Defendant Chairman Gowdy made false and defamatory statements about Plaintiff, including Gowdy's repeated statement that Plaintiff mishandled classified information. Plaintiff did not mishandle classified information and Majority Staff Security Manager Tolar has admitted Plaintiff did not mishandle classified information at any time during his employment by the Committee.  Such a false statement would tend to injure Plaintiff's standing in Plaintiff's business, trade, and profession, which requires him to properly handle classified information on a

regular basis, and in which he has worked for more than 15 years at a federal defense agency on security and foreign policy issues.

96.     Chairman Gowdy made the false and defamatory statements about Plaintiff to numerous third parties without any privilege, including dozens of reporters at national and regional newspapers, broadcast stations, blogs, and web sites.  The false and defamatory statements were published and broadcast by hundreds of different media outlets and were read and heard by millions of people, and Chairman Gowdy intended for them to be so disseminated.

97.     Upon information and belief, Defendant Chairman Gowdy made these false and defamatory statements with knowledge of the falsity of the statements, with reckless disregard for the truth or falsity of the statements, and/or with negligence for the truth or falsity of the statements.

98.     The false and defamatory statements are actionable as a matter of law or are defamation *per se*.  Chairman Gowdy's statement that Plaintiff "mishandled classified information" suggested, imputed, or indicated that Plaintiff engaged in a violation of federal criminal law, as the improper disclosure of classified information can constitute a violation of federal law.  18 U.S.C. § 798(a) (allowing for criminal punishment of up to 10 years for certain "disclosure of classified information").  His statement that Plaintiff "mishandled classified information" is also incompatible with Plaintiff's business, trade, and profession, which requires Plaintiff to properly handle classified information on a regular basis, and significantly impairs and adversely affects Plaintiff's apparent fitness for the proper conduct in the same business, trade, and profession.  In fact, although Plaintiff has applied to return to his prior employment at a federal defense agency, Plaintiff has not yet been able to secure employment in that agency,

despite the fact that he spent 17 years working there on security and foreign policy issues, and had a sterling record and reputation throughout his tenure.

99.     Plaintiff does not seek any damages associated with his common law defamation claim against Chairman Gowdy.   Instead, in asserting his common law defamation claim, Plaintiff seeks equitable relief in the form of a declaration that Chairman Gowdy made false and defamatory statements about Plaintiff and a permanent injunction barring Chairman Gowdy from repeating the same false, defamatory, and injurious statements that he has made about Plaintiff beginning on October 10, 2015. Without such an injunction, Chairman Gowdy will likely continue to repeat the same false and defamatory statements about Plaintiff, which will cause Plaintiff to suffer further harm from the repeating and further publication of such injurious statements.

## COUNT V
### DEFENDANT CHAIRMAN GOWDY'S VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION BASED ON REPUTATION-PLUS AND STIGMA-PLUS THEORIES

100.    Plaintiff re-alleges paragraphs 1 through 99 above and incorporates them as if fully set forth herein.

### REPUTATION-PLUS THEORY

101.    By terminating Plaintiff and accompanying the termination with false and defamatory statements about Plaintiff's reputation and conduct, Defendant Chairman Gowdy violated Plaintiff's due process rights under the Fifth Amendment of the Constitution, based on a "reputation-plus" theory.

102.    As described above, Chairman Gowdy and his agents terminated Plaintiff's employment with the Benghazi Committee on or about June 29, 2015, and, in mid-October 2015, made numerous false and defamatory statements about Plaintiff and his reputation, especially the

false and defamatory statement that Plaintiff mishandled classified information during his employment with the Benghazi Committee.  At the time, Plaintiff had been recently terminated and was seeking to be reemployed by the Committee by exercising his rights under the CAA and USERRA.

103.    Before terminating Plaintiff and making these false and defamatory statements about Plaintiff, Chairman Gowdy did not provide Plaintiff with any process to demonstrate that Plaintiff did not engage in the misconduct that Chairman Gowdy alleged, including the allegation that Plaintiff mishandled classified information.

104.    The false and defamatory statements made by Defendant Chairman Gowdy, including that Plaintiff mishandled classified information, significantly harmed Plaintiff's reputation and his ability to obtain employment in his business, trade, and profession, in which he must properly handle classified information on a regular basis.  These false and defamatory statements have made it significantly harder for Plaintiff to obtain future employment working on foreign policy and security issues for a federal defense agency, or obtain similar work for federal defense contractors that would require Plaintiff to handle classified information on a regular basis.  Already, Plaintiff has attempted to return to his prior employer at the federal defense agency where he worked for more than 17 years on security and foreign policy issues, but has been unable to secure future employment there due to the damage to his reputation as a result of Chairman Gowdy's false and defamatory statements in conjunction with Plaintiff's termination.

105.    Properly handling classified and otherwise sensitive material would be an integral part of Plaintiff's future work on security and foreign policy issues for a federal defense agency or a federal contractor that works on such issues for the federal government.  The false allegation

that Plaintiff cannot be trusted in the handling of classified or sensitive material, when made to numerous, national, and international media outlets by a high ranking Member of Congress and the high profile Chairman of a congressional committee places a black mark on Plaintiff's record that goes well beyond the fact of his termination, and will make it far more difficult for Plaintiff to secure employment in this field.

106.    Chairman Gowdy's false and defamatory statements have caused serious and potentially irreparable damage to Plaintiff's standing in the community and field in which he works as a professional on foreign policy and security issues.

### STIGMA-PLUS THEORY

107.    Based on the same allegations described above, Defendant Chairman Gowdy violated Plaintiff's due process rights under the Fifth Amendment of the Constitution, based on a "stigma-plus" theory.  Under this theory, Plaintiff's liberty interests were violated by Chairman Gowdy because his false and defamatory statements have imposed upon Plaintiff a stigma that will – and already has – foreclosed Plaintiff's freedom to take advantage of other employment opportunities.

108.    Although publication is not necessary for a liberty interest claim based on the "stigma-plus" theory, Chairman Gowdy widely published and publicized the false and defamatory statements about Plaintiff, including the statement that he mishandled classified information, with the purpose and knowledge that making such false statements would cause future employers in the federal government and the private sector to ascribe to Plaintiff a stigma or disability that he cannot be trusted with classified, sensitive, or confidential information, and that would make it exceedingly more difficult for Plaintiff to obtain future employment in the fields in which he has considerable education and experience.  As noted above, the stigma that

Chairman Gowdy intentionally imposed upon Plaintiff with the goal of impugning his personal and professional reputation has imposed a major roadblock to Plaintiff's obtaining full-time employment in the short run and, most likely, in the long run.

## PRAYER FOR RELIEF

Plaintiff respectfully prays that the Court enter an order providing Plaintiff with the following relief:

    (a)    A declaration that the Benghazi Committee's termination of Plaintiff was in whole or in part because of his military service, membership, or obligations and, thus, was an unlawful violation of USERRA, 38 U.S.C. § 4311(a), and the CAA, 2 U.S.C. § 1316(a);

    (b)    A declaration that the Benghazi Committee terminated Plaintiff because Plaintiff took action to enforce and exercise rights and protections afforded to him under USERRA and, therefore, the Committee violated USERRA, 38 U.S.C. § 4311(b), and the CAA, 2 U.S.C. § 1316(a);

    (c)    A declaration that the Benghazi Committee's failure to make the correct contributions to Plaintiff's retirement account, and its failure to give timely and adequate notice to the plan administrator that Plaintiff should receive pension credits for his military service, as required under USERRA, was unlawful and violated 38 U.S.C. § 4318, and the CAA, 2 U.S.C. § 1316(a);

    (d)    A declaration that the Benghazi Committee's violations of USERRA and the CAA were willful pursuant to 38 U.S.C. § 4323(d)(1), and permit Plaintiff to receive liquidated damages for any lost wages or benefits;

    (e)    A declaration that Chairman Gowdy unlawfully defamed Plaintiff;

    (f)    A declaration that Chairman Gowdy violated the clearly established Due Process liberty interests of Plaintiff under the Fifth Amendment of the U.S. Constitution;

    (g)    An order requiring Defendants to fully comply with USERRA and the CAA;

    (h)    An order requiring Defendants to refrain from further discriminating against Plaintiff, retaliating against Plaintiff, or

making any further false and/or defamatory statements about Plaintiff;

(i) An order requiring the Benghazi Committee to reinstate Plaintiff into a position at the level of seniority, status, and pay that he would have enjoyed had the Benghazi Committee neither discriminated nor retaliated against him;

(j) An order requiring the Benghazi Committee to pay Plaintiff all lost wages incurred, the value of lost bonuses, and the value of benefits lost, including lost retirement contributions or lost earnings on retirement contribution, as a result of the Benghazi Committee's violations of USERRA and the CAA;

(k) An order requiring the Benghazi Committee to pay Plaintiff front pay as a result of its violations of USERRA;

(l) An order requiring the Benghazi Committee to pay Plaintiff liquidated damages for its willful violations of USERRA pursuant to 38 U.S.C. § 4323(d)(1)(C) and 2 U.S.C. § 1316(b);

(m) An order requiring Chairman Gowdy to compensate Plaintiff for his economic and non-economic damages resulting from Chairman Gowdy's violations of Plaintiff's Due Process rights, including for the damage to Plaintiff's personal and professional reputation and the damage to Plaintiff's future employment opportunities;

(n) An order requiring the Benghazi Committee and Chairman Gowdy to pay Plaintiff's attorneys' fees and costs for the prosecution of this action;

(o) An order requiring Defendants to pay pre- and post-judgment interest on the amounts of lost wages, benefits, or other damages that the Court awards to Plaintiff;

(p) An order forbidding Chairman Gowdy from further defaming Plaintiff;

(q) An order requiring Chairman Gowdy to provide Plaintiff an opportunity to clear his name; and

(r) An order providing any such other legal and/or equitable relief to that Plaintiff may be justly entitled.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a jury of his peers to try this action.

Dated: November 23, 2015                    Respectfully submitted,


                              By:     /s/ Joseph A. Napiltonia
                                      Joseph A. Napiltonia (# TN0007)
                                      LAW OFFICE OF JOE NAPILTONIA
                                      219 Third Avenue North
                                      Franklin, Tennessee 37064
                                      Telephone: (615) 336-6882
                                      Facsimile: (615) 534-4141
                                      joenapiltonia@gmail.com

                                      Peter Romer-Friedman (# DC 993376)
                                      Conrad Z. Risher (*pro hac vice* pending)
                                      WASHINGTON LAWYERS' COMMITTEE FOR
                                      CIVIL RIGHTS AND URBAN AFFAIRS
                                      11 Dupont Circle NW, Suite 400
                                      Washington, D.C. 20036
                                      Telephone: (202) 319-1000
                                      Facsimile: (202) 319-1010
                                      peter_romerfriedman@washlaw.org
                                      conrad_risher@washlaw.org

                                      Thomas G. Jarrard (*pro hac vice* pending)
                                      LAW OFFICE OF THOMAS G. JARRARD
                                      1020 N. Washington Street
                                      Spokane, Washington 99201
                                      Telephone: (425) 239-7290
                                      Facsimile: (509) 326-2932
                                      tjarrard@att.net

                                      *Attorneys for Plaintiff*